## NEW YORK SUPERIOR COURT.

THOMAS MURPHY, and others, appellants agt. HERMAN BOKER, and others, respondents.

Where a sole *single issue* of fact is presented for the consideration of a *jury* as to what is the proper construction and meaning to be given to a clause in a contract of sale in these words, " plain seasonable No. 1 (buffalo) robes," to settle the quality of the article thus described, and six witnesses testify on that particular issue, *four* for the plaintiff and *two* for the defendant, their verdict for the defendant must be considered on appeal as *conclusive.*

The court can never exclude relevant testimony because it does not establish *at once* the issue to which it relates; the different links must be introduced in succession. The party against whom it is introduced is amply protected against any prejudice, by his right to call on the court to direct the jury to disregard it for all purposes where it is not *prima facie* evidence of any material issue. It is no ground of complaint that the court in such a case has not volunteered to warn the jury against being misled, or a reason to grant a new trial on the ground of an oversight.

Where every *exception* in the case bears on matters not relating to the sole issue submitted to the jury, and *evidence* is rejected not bearing on such issue, although competent for other purposes, the exception to it will not lie.

*Heard General Term, November,* 1864.

*Decided December* 31, 1864.

*Before* ROBERTSON, *C. J.,* MONELL *and* McCUNN, *Justices.*

SOME time prior to the 16th day of September, 1862, the plaintiffs and defendants entered into a negotiation for the sale by the defendants to the plaintiffs of a lot of buffalo robes, which was consummated on the 16th of September, and a memorandum was signed by the defendants as follows:

" NEW YORK, September 16th, 1862.

" We hereby state that we have sold this day to Messrs. Murphy, Griswold & Co., 19 Murray street, about two hundred bales of buffalo robes, *plain seas. No.* 1, more or less, now stored at 29 Dey street, at price of $5.37½ per robe, net cash on delivery. Delivery of fifty bales to be made on next and succeeding Monday.

" HERMAN BOKER & Co."·

The. words " plain seas. No. 1," was interlined in the

memorandum.   On the 22d of September, the defendants
delivered fifty bales of the robes from No. 29 Dey street,
in pursuance of such memorandum, which the plaintiffs
returned to the defendants and refused to receive.   The
defendants on the same day requested the plaintiffs to fulfill
their contract, which they did not do.   The plaintiffs refused
to receive the robes, and never did accept any of them.
The plaintiffs then commenced this action, averring that
the defendants had refused to deliver the goods sold to
them, and claimed damages in the sum of $3,000 for non-
delivery of the goods sold pursuant to the written memo-
randum.   The defendants, among other defences, allege
that they tendered the robes agreed to be sold, and that
the plaintiffs refused to accept them, &c.   There was no
dispute about the fact that the robes mentioned in the
written memorandum as being stored at No. 29 Dey street,
were tendered to the plaintiffs by the defendants, and that
they declined to receive them upon the ground that they
were not "plain seas. No. 1 " robes.

A. R. DYETT, *for appellants.*

I. Under the pretence of establishing a title to affirma-
tive relief by conforming the terms of the contract to the
one really made, evidence of extemporaneous conversations,
and of an alleged parol agreement was let in, which while
it utterly failed to establish any mistake was before the
jury, and could not fail to affect their decision by inducing
them to believe that the words in question in the contract
were entirely immaterial and of no consequence, because
we had a full opportunity to examine the goods, and under-
took to do so, and our not doing so was our own fault, *ergo,*
" *caveat emptor !* " said the jury, and the defendant had a
verdict.   Had the jury been governed by the evidence
upon the question whether the robes were such as described
in the contract (and which was the only question in the

case), their verdict must have been the other way, or it would have been against evidence (see point VII, infra). It is scarcely necessary to cite authority to show that the evidence in question, except to show such a mistake in reducing the contract to writing as would call on a court of equity to reform it, could not have been admitted. The plaintiff could take no valid objection to the testimony when offered, and if it failed to prove the facts which it was offered to establish, it was in vain to attempt to overcome its effects upon the jury by any argument or charge from the court. The defendants evidently never expected to prove either fraud or mistake in reducing the contract to writing, but cunningly adopted that theory for the purpose of getting in this improper evidence, and they succeeded, but the court will not permit the plaintiffs to be thus defrauded of their verdict, and will grant a new trial on this ground alone. (1 *Grah. & Wat. on New Trials*, 54, 56, 361, 362, 369, 370; 2 *Id.* 43, 47, 50, 613, 645; 3 *Id.* 1204, *et seq.* 1527.)

II. The court erred in admitting the question put to the witness Funke, one of the defendants, by his own counsel: " Did you or not state positively what the quality of these goods was ?" The answer of the witness illustrates the error. The written contract did positively state the quality, but the defendant was permitted to swear he " only expressed an opinion," which we concede would not be a warranty, or bind the defendants 'to deliver that quality of goods, and so doubtless the jury supposed. Such evidence was not even admissible to prove the defendants' allegation of mistake in inserting the words " plain seas. No. 1." not only because it did not tend to prove any such mistake as the court could take notice of, but because the witness' previous testimony showed that no such mistake had occurred.

III. The court erred in admitting the question at folios

61, 62.  The previous question put to the witness and answered by him, was the proper one.

IV.  The court erred in admitting the question, " what was the quality of those robes at that time ?" for the reasons stated in the grounds of objection set forth in the case (*Code*, §§ 78, 159).

V.  The court erred in excluding the question at folio 83, to the plaintiff Murphy.  The object was to contradict Funke (*fols.* 28, 32, 34, 37, 38, 39, 41, 52, 53), but was competent for that purpose.  *And see next point*, and the witness Murphy's previous evidence.

VI.  The court erred in excluding the question at folio 84, to the same witness.  It was not only competent to contradict Funke (*fols.* 29 *to* 54, *epecially* 33 *to* 42), but was .competent in rebuttal.  Besides, as shown in our first point, the defendant had been permitted to smuggle in evidence of the conversations cotemporaneous with the contract and *inter alia*, that as they pretended, they did not know the meaning of the words " plain seas. No. 1." . Yet this statement was allowed to go to the jury, and Murphy was prevented from showing that the defendant Funke, who made the contract and interlined these mystic words, did so without any pretence of ignorance of their meaning.  The evidence was highly important, and the error was fatal in excluding it.

VII. .The verdict, regarding the sole question to be (as it is) whether the buffalo robes tendered were such as described in the contract, was so clearly against the evidence as to show that the jury were influenced by partiality or prejudice, or misapprehended the evidence.  Evidence for the plaintiffs,—Murphy, Michael Ball, Bouton, McKenna,— four witnesses :  Evidence for defendants (*see point III*), *one witness only*, because the defendants' witness, Munroe, the clerk of defendants other witness, states that he understands "*plain seasonable No.* 1," to be the *same thing as* " *No.* 1," upon which point all the other witnesses, including

his employer, differ from him, and it is entirely inconsistent with the whole theory of the defendants' case. (7 *How. Pr. R.* 64 ; 1 *Cowen,* 109 ; 1 *Caines' R.* 162 ; 6 *Hill,* 444.) . The judgment should be reversed and a new trial ordered.

IRA D. WARREN, *for respondents.*

I. The only question submitted to the jury in this case was whether or not the robes tendered to the plaintiffs were what are known in the trade as " plain seas. No. 1 " robes. The jury found this in favor of the defendants, which finding is fully sustained by the evidence.

1. There was no standard for " plain seas. No. 1 " robes. In Murphy's testimony he swears he was in the habit of selling No. 3 for No. 1 to his customers.

2. The witness Herbeck, who afterwards· bought this lot of robes and sold them to his customers, swears that they were in his opinion ·" plain seasonable No. 1." Also the. witness Munroe, who saw and examined these robes, and sold a large part of them.·

3. The plaintiff swears that he examined six bales of the robes and found the poorest of them as good as he sold to his customers as No. 1. He swears that No. 3 was No. 1 when robes were not plenty. The whole evidence upon that subject fully sustains the verdict, and there is no such preponderance in favor of the plaintiffs as to warrant a new trial. · (6 *Cowen,* 682 ; 7 *Barb.* 271 ; 27 *Barb.* 528 ; *Stoddard* agt. *Long Island R. R. Co.* 5 *Sandf.* 180 ; *Adsit* agt. *Wilson,* 7 *How.* 64.)

II. The first exception taken by the plaintiffs to the question : " Did you state positively what the quality of those goods were ?" is not well taken. It had no bearing on the question upon which the case went to the jury, and the answer could have no possible bearing as to whether the' robes were " plain seas. No. 1." The motion at folio 54, was to strike out testimony the plaintiff had called out in

answer to a direct question. No exception was taken to this ruling (*Starkie on Evidence*, 144, 145, § 27). The next exception is not well taken. It was competent and proper to prove what a "plain seasonable No. 1" robe was, and if the objection was to the form of the question, it should have been so stated. The last exception is not well taken. The answer avers performance on the part of the defendants. The two exceptions at folio 83 are not well taken. They were questions put to the plaintiff, who had once been fully examined, and were not in rebuttal. It was immaterial how they got at the price. It could not determine whether they were "plain seas." robes or not. The jury found that the robes were "plain seas. No. 1," upon the only question submitted to them, and all these exceptions become immaterial. (*Smith* agt. *Kerr*, 1 *Barb.* 155; *Craig* agt. *Sprague*, 12 *Wend.* 41; *Hayden* agt. *Palmer*, 7 *Hill*, 118; *Forest* agt. *Forest*, 6 *Duer*, 102.)

III. All the questions of law as to the validity and construction of the pretended contract were decided by his honor the judge at the trial, in favor of the plaintiffs. But if he erred in so doing, and by a correct construction of the contract the plaintiff cannot in any aspect of the case recover, then the court will not grant a new trial if proper evidence was rejected, or improper evidence was admitted. (*Elsey* agt. *Metcalf*, 1 *Denio*, 323; *Edmonston* agt. *McLoud*, 16 *N. Y.* 543; *Horton* agt. *Hendershot*, 1 *Hill*, 118; *Hayden* agt. *Palmer*, 7 *Hill*, 385; *Hyle* agt. *Nelson*, 2 *John.* 46.)

IV. The contract claimed to have been made was for $12,480.75 worth of buffalo robes, and as nothing was paid and no part of the goods delivered, the contract must be in writing, and must be subscribed by the parties to be charged thereby.

1. It was only signed by the defendants. The plaintiffs do not agree to take the robes; they do not agree to do anything. There is no mutuality. The case of *Lester* agt. *Jewett* (12 *Barb.* 502), is directly in point.

2. It is not *the contract*, but a statement in writing that the defendants have sold, viz.: by some other contract.

3. There is no consideration expressed in the contract, and none was proved on the trial; the plaintiffs do not agree to take the robes; they do not agree to pay for them, and not a word importing a consideration appears on the face of the contract, nor in the evidence. It is essential that the memorandum required by the statute of frauds should be a mutual, complete, valid, binding contract in all its parts, and if no consideration is expressed one must be proved. (*Burnet* agt. *Bisco*, 4 *John.* 235 ; *People* agt. *Howell*, 4 *John.* 293 ; *Parsons on Contracts, vol.* 1, *p.* 353; *U. & S. R. R. Co.* agt. *Brinkerhoof*, 21 *Wend.* 141.) The legislature did not intend when they enacted the statute of frauds, to make contracts less formal, nor to make contracts which were not contracts before. It simply requires *the contract*, of which the consideration is an essential part, to be reduced to writing. Under this agreement the plaintiffs were not bound to take the robes. (*L'Amoreux* agt. *Gould*, 3 *Selden*, 349 ; *Lees* agt. *Whitcomb*, 5 *Bing.* 34.) In the case of *Sears* agt. *Brink* (3 *John.* 209), which was decided before section 2 of the statute of frauds was amended, requiring the *consideration* to be expressed in the agreement, the court held that the memorandum in writing must show the consideration. When this decision was made, section 2 of the statute of frauds stood as section 3 now does. This decision has never been reversed, but has been referred to with approbation (*Brewster* agt. *Silence*, 4 *Selden*, 212).

V. By the terms of this memorandum it was the sale of a certain lot of robes, particularly pointed out and identified, viz. : " About two hundred bales, more or less, now stored at No. 29 Dey street." This was a sale of an ascertained and identified article, and not of a particular class or description of goods. In this case nothing but the identical goods sold would answer the contract, and the purchaser could call for none other under it. There is a clear

distinction between this and the sale of a particular class or description of goods, which can be filled by furnishing goods fairly answering the description given in the contract, and under which the purchaser has a right to call for goods of such description (*Addison on Contracts*, 2d *American edition*, 228).

(*a*) The plain significance of the language, the words "*more or less*," and the evidence at folios 12, 13, and throughout the case, show conclusively that none other than these particular robes were referred to or intended by the parties.

(*b*) The remedy of the plaintiffs if the goods did not answer the description was to refuse to receive them, and rescind the sale, or if the representation amounted to a warranty, to take the goods and bring an action on the warranty.

VI. The words "*plain seas. No.* 1," were not a warranty, or a representation amounting to a warranty. A tender of the robes at 29 Dey street, was a compliance with the contract, and this view is fully sustained by the cases. (*Jennings* agt. *Gratz*, 3 *Rawle*, 168 ; *Carley* agt. *Wilkins*, 6 *Barb*. 557 ; *Windsor* agt. *Lombard*, 18 *Pick*, 1 ; *Farley* agt. *Bispham*, 10 *Barr*. 320.)

(*a*) The plaintiff had an opportunity to examine the goods, and in the absence of fraud the rule *caveat emptor* applies. (*Bierne* agt. *Burnside*, 1 *Selden*, 95 ; *Salisbury* agt. *Stainer*, 19 *Wend*. 159.)

VII. If the contract be held to be a sale with warranty of quality, the plaintiffs having sent back the part of the goods they had received, and refused the balance, and the defendants assenting, the contract was rescinded and at an end, and neither party is entitled to damages against the other. A purchaser with warranty cannot refuse to receive the goods and then recover for a breach of warranty. The ground of the action upon a warranty is that the goods *delivered to and received* by the purchaser do not answer the

warranty contained in the contract, and the measure of *damages* in all cases of a warranty is the difference between the value of the goods *delivered*, and that of *such goods* as they were warranted to be. (*Voorhies* agt. *Earl*, 2 *Hill*, 288, 291; *Crary* agt. *Graman*, 4 *Hill*, 625; *Muller* agt. *Eno*, 14 *N. Y.* 601; *Collins* agt. *Brooks*, 20 *How.* 237.)

VIII. The judgment should be affirmed, and the motion for a new trial denied with costs.

By the court, ROBERTSON, C. J. The learned judge before whom this cause was tried, submitted a single issue of fact to the jury, to wit: Whether the articles tendered by the defendants in satisfaction of the contract in controversy, were such as were generally known to the trade as *plain seasonable No.* 1 (*buffalo*) *robes*, and on all other points ruled as requested by the plaintiffs. He called their attention to the fact that there was a certain assortment of robes known in the trade as "P. Chouteau's No. 1 plain seasonable," and that was a standard description. * * * But the words used in the contract were "*plain seasonable No.* 1," the word "*Chouteau*," not being introduced. No exception was taken to the charge. A motion for a new trial on a case was denied. An appeal is taken from the order denying it, as well as the judgment. The main ground for moving to set aside such verdict is, that it was so clearly against evidence as to show partiality, prejudice or misapprehension on the part of the jury. And the admission of evidence to prove a mistake in the contract, which it failed to establish, is supposed to have contributed largely to such result.

The testimony of six witnesses was directed to the issue thus submitted to the jury. Two besides the plaintiff Murphy, and their porter (Ball), were introduced on the part of the plaintiffs, to wit: Mr. Bouton, a dealer in buffalo robes, and his porter (McKenna), and two on the part of the defendants; one of them, to wit; Mr. Herbeck, a

dealer in furs, and his salesman (Monroe). No meaning seems to have been attributed to the word "plain" beyond its ordinary sense. "*Seasonable*," was held to be applicable to skins obtained in the winter season, full grown, full furred, of dark color and good pelt. The principal difficulty was to settle the meaning of the term "*No.* 1," either with or without those words. Robes sent to the market as "*Chouteau's*," in the original packages, and sold as *No.* 1 *plain seasonable Chouteau's*, are understood to be of a certain kind, and are not generally examined by buyers. After those packages were broken and a new assortment made, it seems to have been difficult to fix the standard. Mr. Bouton (the buffalo robe dealer), who as he stated, always referred to those sold in the market as "Chouteau's original assortment," when he spoke of quality, testified that there was no assortment after it left Chouteau's hands, there was *no particular grade for No.* 1. "After leaving Chouteau's, *plain seasonable No.* 1, had a meaning within ten or fifteen per cent." When he sold his own *plain seasonable No.* 1 robes, he always showed them. If a person sold without reference to Chouteau's standard, but in reference to the market, he ought to come within ten or twenty per cent of the original. The plaintiff Murphy testified, that there was no such thing as No. 1 robes. He did not know of any mark No. 1. There were no No. 1, but plain seasonable Chouteau's. Mr. Bouton reassorted his robes, and marked them No. 1, plain seasonable. Mr. Herbeck testified, that there had *been no standard* for what was known as plain seasonable No. 1 robes. "Every dealer made a different assortment. A No. 1 seasonable skin is supposed to be a very good skin; there are better skins, and they are making better every day." * * * "*There is no standard* by which to determine a strict No. 1." No. 1, plain seasonable Chouteau's * * * has reference to the size and quality of the robe." Mr. Monroe understood *plain seasonable No.* 1, to be the same as No. 1.

There was also some evidence that there was a class of robes known in the trade as No. 1, *imperfect.*" Herbeck testified, that a *patched robe* was an *imperfect* skin. Ball (the plaintiffs' porter) testified, that either a patch on or a hole in it made it imperfect. There appears also to have been other robes known to the trade, designated as Chouteau's plain seasonable No. 2, and No. 3, and imperfect, or No. 4. Seasonable No. 2, was a full pelted skin, not as dark as No. 1, but a kind of yellow; the difference between it and No. 1, was in the color; it was larger than No. 3. No. 1 *damaged*, was a skin with spots in it; No. 2 *imperfect*, was where they were patched; No. 2 *damaged*, was an imperfect No. 1, with several spots on it, or holes in it; No. 3 was a No. 1 robe, with five or six spots in it; No. 4 was the worst quality, and was known as *plain seasonable imperfect.*

The testimony as to the character of the robes tendered by the defendants, consisted of that of Messrs. Bouton, Herbeck, Ball and McKenna, besides that of the plaintiff Murphy. The first named (Bouton), examined a lot of buffalo robes in bales, in the store where those in question were deposited, about the time of the sale. He examined twelve or fifteen bales taken promiscuously from the pile, and handled over every bale in the lot. They were mixed robes, according to Chouteau's original assortment, No. 1s, 2s and 3s. One-third No. 1, plain seasonable, all the rest inferior. His porter (McKenna) testified, " they were cut with rats; they were not perfect; * * * they were not like the company's robes at all." Mr. Herbeck bought two hundred and fifteen bales of the same lot, including about five and a half bales of loose. He examined fifty of the bales he bought at his own store, and opened a dozen before he bought. He considered them, except the loose skins, *No.* 1s, and sold them as such. He bought them for *plain seasonable No.* 1 *Chouteau's*, and in his opinion they were so. He found no No. 1 imperfect, or No. 2 in that

lot, except the loose skins.   The plaintiff Murphy, testified, that of the fifty bales delivered to him, he examined some *six or eight*.   They were *inferior* to the robes mentioned in the contract.   They differed in *qualities*.   Some few were good, but the majority were *inferior*.   Out of six bales containing seventy-two robes so examined, three-eighths only complied with the contract; nearly one-third were *No.* 1*s*, *imperfect*; over about one-fifth *No.* 2*s*, *regular*; two were *No* 2*s*, *imperfect*, and two *No.* 3*s*; all of inferior value to those mentioned in the contract.   This evidence was corroborated by that of his porter (Ball).

The onus lay on the plaintiff of establishing what was meant by *plain seasonable. No.* 1*s*, and if it meant only according to *Chouteau's standard*, that it did so even when no such name was expressed.   There was evidence enough in the case to sustain a finding that it did not, and that it was intended merely to describe an assortment of a high character, within ten or twenty per cent of that standard, and that the limits were very vague.   It is evident from the whole testimony of the plaintiff and his porter, they were testifying as to the inferiority of the goods tendered measured by the Chouteau standard.   Neither of them describe the nature of the imperfection or inferiority stated by them, although Ball described the different grades of robes and the titles by which they are known.   There was room, therefore, for the jury to infer that there was no such absolute standard as *plain seasonable No.* 1*s*, without Chouteau's name, or that it had a wide scope as to the quality of the goods, or that the plaintiffs did not make out a specific difference between the goods tendered and that standard.   That verdict has deen sustained by a justice of this court at special term, in the exercise of his discretion.   And even if we would have come to a different conclusion sitting in place of the jury, that would not warrant an interference with the verdict.   (*Stoddart* agt.

*Long Is. R. R. Co.* 5 *Sand. S. C. R.* 180 ; *Dent* agt. *Farmers' Bank at Bridgeport*, 27 *Barb. R.* 337.) There certainly is no such preponderance of evidence as to induce us to think that the verdict of the jury originated in either passion, prejudice or mistake (*Cohen* agt. *Dupont*, 1 *Sandf. S. C. R.* 260). They were directed to confine their attention to a single issue, in the clearest terms, and were expressly warned against taking into consideration the fact that the goods tendered were those in the store mentioned in the memorandum. It is said, however, that the jury were allowed to hear and were not directed to disregard certain testimony admitted to establish an issue made by the defendants of a mistake in the contract, with a view to its reformation, It is very evident that the court can never exclude relevant testimony because it does not establish at once the issue to which it relates. The different links must be introduced in succession. The party against whom it is introduced is amply protected against any prejudice, by his right to call on the court to direct the jury to disregard it for all purposes, where it is not *prima facie* evidence of any material issue. Where his counsel neglects to do so, the court has a right to presume he does not think the evidence of sufficient importance to require such a caution. It is no ground of complaint that the court in such a case has not volunteered to warn the jury against being misled, or a reason to grant a new trial on the ground of an oversight.

Every exception in the case bears on matters not relating to the sole issue submitted to the jury. In reference to the evidence therefore rejected, not bearing on such issue, although competent for other purposes, no exception would lie (*Purchase* agt. *Mattison*, 6 *Duer's R.* 587). An exception was taken to a witness being required to answer : " *What the quality of certain robes bought by him from the same lot as those bought by the plaintiff was ?*" upon the ground that the defendants admitted in their answer that the latter did

not correspond with the contract. Whereas the answer in its second defence alleged a tender to and refusal by the plaintiffs of the *buffalo robes agreed to be sold,* which took away the ground of such exception. The plaintiff Murphy, was prevented from testifying whether anything was said in his negotiation with the defendant Funke, *about knowing what such robes were.* That was claimed to be admissible, because such defendant gave as a reason on his cross-examination by the plaintiffs' counsel for not having stated that such robes were *plain seasonable No.* 1, *that he did not know* its meaning, which was quite different from his stating that as a reason at the time. A dealer in robes (Herbeck) was asked what he regarded as *plain seasonable No.* 1 *robes?* upon which he certainly had a right to express his opinion as an expert. The defendant Funke, was asked whether in the negotiation of sale he stated *what the quality of such goods* was? which was admissible to contradict a previous statement of the plaintiff Murphy, that Funke gave him *a statement that they were plain seasonable No.* 1. These constituted the only exceptions to testimony except one to the exclusion of a question put to the plaintiff Murphy, to detail a conversation by which he and the defendant Funke, *got at the price of the goods,* which was entirely immaterial.

The verdict of the jury being warranted by the testimony, and no exception to evidence being well taken, it will not be necessary to consider the other views taken by the counsel for the defendants. The grave questions whether the contract was not void under the statute of frauds? Whether a particular parcel of goods in a particular store only was sold? Whether the use of the words *plain seasonable No.* 1, made a representation or a warranty? and if the former, whether the defendants were liable without proof of a fraud? or if the latter, whether the refusal by the plaintiffs to receive the goods did not rescind the contract? are not necessary to be passed upon.

The order denying a new trial, and the judgment, must therefore be affirmed, with costs.